## FOREST CECIL MINGLE v. STATE.

No. A-575. Opinion Filed May 16, 1911.

(115 Pac. 616.)

1.   APPEAL—Failure of Plaintiff in Error to File Briefs. When an appeal is perfected in this court, and no counsel appears and no briefs are filed on behalf of a plaintiff in error, this court will examine the record for fundamental errors only, and discovering none the judgment appealed from will be affirmed, under rule 4 of this court (1 Okla. Cr. x, 101 Pac. xii.)

(Syllabus by the Court.)

*Appeal from District Court, Oklahoma County; John J, Carney, Judge.*

Forest Cecil Mingle was convicted of murder, and he appeals. Affirmed, with directions.

*Giddings & Giddings,* for plaintiff in error.

*Chas. West,* Atty. Gen., and *Smith C. Matson,* Asst. Atty. Gen., for the State.

ARMSTRONG, JUDGE. An information was filed against the plaintiff in error in the district court of Oklahoma county on the 5th day of April, 1909, after he had had a preliminary examination as provided by law, charging him with having murdered Mrs. Pearl Pearson of Oklahoma City on the 16th day of September, 1908. The case came on for trial on the 28th day of June, 1909, and a verdict of guilty was returned by the jury on July 17, 1909, fixing his punishment at imprisonment for life at hard labor in the state penitentiary. Motions for a new trial and in arrest of judgment were filed and overruled, and on the 24th day of July thereafter judgment and sentence was pronounced by the court in accordance with the verdict, from which judgment this appeal is prosecuted.

It appears that the deceased was living with her husband, Harry Pearson, and conducting a boarding house in Oklahoma

City during September, 1908; that they were married at Iola, Kan.; that deceased was a daughter of J. D. Man, a hotel proprietor of that place. About 1 o'clock on the 16th day of September, 1908, Mrs. Pearson left home saying that she was going down town to take treatment from a physician, and that she would return about 4 o'clock; that at this time she carried with her about $75 in money and wore two diamond rings. About 1:30 or 2 o'clock she appeared at the home of a Mrs. Strimple in company with the plaintiff in error, and they claimed to be on their way to look at some vacant lots a few blocks further out. She was not heard from again until about 5 o'clock in the evening, when she came to the home of a Mr. Putman, suffering from three bullet wounds, apparently from a 38 caliber revolver, and in a dying condition. She was carried from there to the hospital, and died about two or three hours afterwards.

While at the Strimple place, plaintiff in error, under the name of Parker, was introduced to a man by the name of Bennett. Mrs. Strimple testified that she was not sure whether she had seen plaintiff in error before at her place, but knew Mrs. Pearson. They tried to borrow a buggy and horse from Mrs. Strimple; but she refused them, and they went away. Before leaving Mrs. Strimple's, plaintiff in error tried to get Mrs. Pearson to let him have her diamond rings, which she refused, saying: "Not on your life." About 4:30 o'clock plaintiff in error came back to Mrs. Strimple's alone and tried to get the horse and buggy, and said he wanted to take Mrs. Pearson to Britton or Edmond, and was again refused. He then went over to a place on West Twenty-Sixth street, and there arranged to hire a boy named Shaw to take him to Edmond. Shaw's horse gave out, and he drove to Britton, where other arrangement were made to go on to Edmond. When they started out from Oklahoma City, plaintiff in error represented to the Shaw boy that he had a very sick brother at Edmond and wanted to get there at once, in order to see him alive. When they started north on the road to Britton, they were traveling the street which goes by the

Putman house, and near the scene of the tragedy. The plaintiff in error suggested that they don't go that way, but that they go three or four blocks west to Fiftieth street and back to the road leading to Britton. From Britton plaintiff in error was carried to Edmond by a boy named Willie Brown. On arriving at Edmond, he went immediately to a restaurant and tried to secure a drink of whisky, and failing ate supper. He appeared very nervous, and inquired repeatedly about a freight train for the north, which came shortly, and he went on to Guthrie on the freight train. About 11 o'clock that night, he appeared in a restaurant in Guthrie and displayed two diamond rings, which were later identified as the rings of Mrs. Pearson. He appears to have left Guthrie during the night, having stated that he was going to Wichita. About 8 o'clock on the morning of the 17th of September, he showed up at Crescent, saying he had walked all the way from Tulsa, and was on his way to Enid; was apparently in a very great hurry. He procured breakfast at the home of a Mrs. Fleming.

He was next seen at Lovell, where he procured a team at a livery stable. When he procured this team he stated that he wanted to drive west; but, instead of driving west, went north. The liveryman upon learning this telephoned some one at Marshall to head him off and recover the team. D. Overstreet and Floyd Thorp, stockmen living in that neighborhood, met the plaintiff in error, who told them he had just moved into the neighborhood, and that he had recently traded for the team, and that they could satisfy themselves by inquiring at the livery stable. They went back to Marshall, a short distance, and after investigation became convinced that he was the party wanted and was driving the team beloging to the Lovell liveryman, and they immediately set out in pursuit of him. When they came upon him, he got out of the buggy, turned the team loose, and escaped down a ravine. The sheriff of Enid was telephoned, and he captured the plaintiff in error about three miles from Enid and put him in jail. Plaintiff in error wore tan shoes when he

left Oklahoma City and at the time he was arrested by the sheriff at Enid; but while in the jail at Enid he traded the tan shoes to another prisoner for black ones. On the 20th of September, he was turned over to the sheriff of Logan county, who carried him back to Guthrie, where he was released on bond on the 26th of September. On the 28th of September, he appeared in Wichita, Kan., and said he was going to Enid. On the 29th he went to a livery stable in Enid and hired a rig, and said he was going out northwest to see a friend. He drove as far as Cremlin, where he took a train, saying he was going to Wichita that night.

A photograph had been procured of the plaintiff in error in the meantime from a sister of the deceased, Miss Man, of Iola, Kan., by Sheriff Garrison, who had a large number of others made from it, and sent them over the country to various police officers; one of them getting into the hands of the police of Wichita, Kan. On the night of the 29th of September, a Wichita policeman named Thompson, with other officers, went out to the place where plaintiff in error was living with his father-in-law. Shortly after midnight some one came from the alley and went into the house. Several officers surrounded the house and demanded admittance. They were at first refused, but later admitted. When they went in, they said they were looking for a man named Harry Parker. The plaintiff in error stepped up, and said, "Maybe they're looking for me," or "Maybe there're wanting me." One of the officers replied, "Yes; you are the man that we want." The photograph was produced and plaintiff in error remarked, "They've got a picture of me. Where did you get it?" On looking at the photograph and discovering that a reward was written at the bottom of it, he denied that it was his. He was taken down to the city jail in Wichita, and later delivered to Sheriff Garrison of Oklahoma county for extradition. After his arrest the officers went back to the residence where the arrest was made, and found the ring worn by Mrs. Pearson the afternoon of the murder secreted in a dictionary in the house. The father of the deceased identified

the plaintiff in error as the person who boarded at his house during the fall of 1907, under the name of Harry Parker. He was identified by many other witnesses who had been associated with him, by his writing, and by the various persons mentioned herein, and others who saw him on the day of the murder and immediately following.

The shooting appears to have been done near the home of Robert Putman in the outskirts of Oklahoma City. Mrs. Lasley, who was housekeeper for Putman, testified that she heard some shots and a person scream, and this repeated twice thereafter. That she ran out in the yard to see what the trouble was, and the woman, Mrs. Pearson, came up and fell on the other side of the house on the porch, and said she was shot. Help was called in, and an ambulance was telephoned for. Mrs. Pearson lay on the porch for something like an hour, growing weaker all the time, and while there told Mrs. Lasley about the shooting, saying, "Harry Parker did it. Don't forget the name." This same statement was made to Mrs. Stert. Bert Layman testified that he lived on Thirty-Ninth street, in Oklahoma City; that he was right across the road from Bob Putman's the afternoon the shooting occurred; that he heard shots and heard a woman holler; that the next morning after the shooting he went down to the place and found a leather purse in a ravine; that he saw where the weeds had been trampled down, and that the purse was in the ravine just east of this. A deputy sheriff inspected the locality where this murder is alleged to have taken place, and found tracks comparing with the tracks of the plaintiff in error and of the deceased, and a comb and other articles identified as the property of the deceased. He also found indications of where a person had been dragged some distance.

The defense of the plaintiff in error was an alibi; his contention being that of mistaken identity. Taken as a whole, the proof of guilt is so clear that not even a suspicion of innocence could be indulged in by a reasonable mind. A more diabolical murder than that we are now reviewing is not disclosed by the records

of this court. The plaintiff in error murdered a defenseless woman for the purpose of robbing her of less than $300. The proof of his identity and of his guilt is overwhelming. It is remarkable that 12 jurors could be found who, under the record before us, could agree upon a punishment less than death.

The petition in error and case-made were filed in this court on the 24th day of January, 1910. No brief has been filed upon the part of the plaintiff in error, and the state has filed a motion to affirm for want of prosecution, under rule 4 of this court (1 Okla. Cr. x, 101 Pac. vii). Upon a careful examination of the record, we discover no fundamental error. The motion of the Attorney General is well taken and is sustained.

The judgment of the lower court is affirmed, with directions to that court to enforce it.

FURMAN, PRESIDING JUDGE, and DOYLE, JUDGE, concur.